[Cite as *State v. Campbell*, 2026-Ohio-2710.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HIGHLAND COUNTY

STATE OF OHIO,                    :        CASE NO. 25CA24

    Plaintiff-Appellee,           :

    v.                            :        DECISION AND JUDGMENT ENTRY

TIMOTHY B. CAMPBELL,              :

    Defendant-Appellant.          :

_____
APPEARANCES:
Angela Miller, Jupiter, Florida, for appellant[1].

Anneka P. Collins, Highland County Prosecuting Attorney, and
Adam J. King, Assistant Prosecuting Attorney, Hillsboro, Ohio,
for appellee.

_____
CRIMINAL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED:7-8-26
ABELE, J.

{¶1}  This is an appeal from a Highland County Common Pleas
Court judgment of conviction and sentence.  Timothy Campbell,
defendant below and appellant herein, raises three assignments
of error for review:

        FIRST ASSIGNMENT OF ERROR:

        "THE TRIAL COURT'S SENTENCE OF APPELLANT,
        WHICH INCLUDED BOTH THE MAXIMUM JAIL TERM
        AND THE MAXIMUM FINE, WAS AN ABUSE OF
        DISCRETION.  R.C. 2929.22."

_____
[1] Different counsel represented appellant during the trial court proceedings.

SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT ABUSED ITS DISCRETION BY
IMPOSING A DISTRICT-WIDE EMPLOYMENT
PROHIBITION AS A CONDITION OF STAY PENDING
APPEAL.  U.S. CONST. AMENDS. VIII, XIV; OHIO
CONST. ART. I, §§ 9, 16; OHIO APP.R. 7."

THIRD ASSIGNMENT OF ERROR:

"THE REPRESENTATION PROVIDED TO CAMPBELL
FELL BELOW THE PREVAILING NORMS FOR COUNSEL
AND AFFECTED THE OUTCOME OF HIS SENTENCING
IN VIOLATION OF THE FIFTH, SIXTH, AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION, ARTICLE I, §§ 2, 10, AND 16 OF
THE OHIO CONSTITUTION."

**{¶2}** In May 2025, a Highland County Grand Jury returned an indictment that charged appellant with one count of felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony.  Appellant entered a not guilty plea.

**{¶3}** At appellant's September 29, 2025 jury trial, Rhonda Matracia testified that she is employed at the local VFW and on February 14, 2025 observed appellant enter the VFW and order a drink at the bar.  After she said hello, she lost him in the crowd until "there was a commotion . . . at the back end of the bar.  The band stopped playing, and the lights came on." Appellee played State's Exhibit 1, the VFW surveillance video, for the jury.  Matracia stated that when she got to the victim, she observed blood on him and he "was lying on the floor, his wife was hovering over him, he was completely unconscious."

{¶4} VFW bartender Dorothy Leath worked the night of February 14, 2025. Leath said that as appellant entered the VFW, the victim (Shane Fligor) sat at a table in a corner with his wife. When appellant entered, he "came in and ordered a beer and mingled, and then he ended up over there in the corner, and [appellant] was pointing at [Fligor], I didn't hear what he said." Then, Leath testified, "I saw [appellant] hit [Fligor] two times." Similarly, VFW employee Chuck Bender "saw [appellant] walk in, looked like him and [Fligor] was having a conversation and then [appellant] started swinging... at Fligor." VFW employee Donita Palmer testified that on February 14, 2025, she was outside on a "smoke break" when appellant left. Palmer said, "Hey, Campbell, what is wrong?" And appellant "is like, well, I just beat the f*ck out of somebody."

{¶5} VFW patron Brandi Tait testified that on February 14, 2025 she observed appellant approach the victim, and "heard him say something to the effect of, I didn't say I thought you were gay, Shane, so it made me take notice of what was going on." When Tait looked back a moment later, "it literally looked like Shane's head was bouncing off the wall like three or four times, and then Shane went to the ground, and he definitely looked out." Tait explained that appellant hit the victim, he fell out of his chair to the floor, and "there was blood everywhere," and it looked like the victim lost consciousness.

{¶6} VFW patron Angela Hurless observed the victim sitting behind her. Hurless noticed appellant enter the VFW, get a drink, and then he "ran toward [Fligor] and hit him." After appellant "hit [Fligor] that one time," Fligor "hit the floor," and had "blood all over him." Outside the VFW that evening, patron Bridget Davis testified that about a year before, she joined the victim and his wife and some friends at Furman's, where appellant approached her and said, "he was sorry that I had a fagot for a friend."

{¶7} Greenfield Police Patrolman Quinton Smith testified that Shane Fligor entered the police station between 10:00 and 11:00 p.m. with "blood coming out of his ear, . . . an abrasion on his nose, [and] blood on his jacket . . . pants and shoes." Fligor told Smith that appellant "struck him in the face multiple times, causing him to go unconscious. . . he couldn't remember what happened after he got hit." After Smith photographed Fligor's injuries, he and another officer searched for appellant for about 30 minutes and eventually visited the VFW, where they spoke with managers and requested video footage. Smith testified that, after they called appellant and told him they had an arrest warrant, appellant drove to the station and turned himself in.

{¶8} Emergency Department Physician Dr. Daren Barker testified that on February 14, 2025, Fligor arrived with "a

laceration to his right ear, it had some bleeding, he had an abrasion to his nose, some facial contusions, mostly to the nose as well." A CT head scan revealed a nondisplaced fracture of the left tip of the nasal bone. In addition, the victim also suffered a cervical (neck) sprain and neck tenderness and told Barker that he had lost consciousness for less than a minute. Barker repaired the laceration to the right ear. Barker's note said, "[Fligor] was knocked against the wall and was witnessed to be unconscious for less than thirty seconds." Barker prescribed Toradol, a non-steroidal anti-inflammatory for pain, Cephalexin, an antibiotic, Robaxin, a muscle relaxer, and ibuprofen.

{¶9} Victim Shane Fligor serves as a substitute teacher at McClain High School and an assistant instructor/mentor for the McClain Cadet Corps, "similar to an Army or Air Force Jr. ROTC program." Fligor served 23 years on active duty, including three Iraq deployments and one to Bosnia, and retired in 2021. Fligor is married to his wife, Jennifer.

{¶10} Fligor met appellant at McClain High School in 2023 or 2024, "where [appellant] was also working as a substitute teacher." Fligor had a few interactions with appellant outside of the school, and the two did not speak to each other at the high school. Fligor explained:

> The first time I had gone to see a band at Catch 22 there in Greenfield, I was back up against the back wall.  Tim [appellant] came up to me he said, 'I know you, you work at the school,' and I said 'yes.'  And he said, 'you need to f*cking lighten up.' . . . nobody at the school likes you, the students don't respect you and they make fun of the way you dress.

**{¶11}** At the second interaction, "my wife and I had just got done with a cadet corps event, we decided to go to the VFW, I was in my military uniform.  Appellant approached and said, "That is f*cking gay."  Appellant and his wife left.  For the third interaction, Fligor and his wife joined friends at Furman's restaurant when appellant approached their table, and "asked the ladies that were with us, my wife and two other ladies what they were doing with me.  My wife said, 'I'm his wife,' and he said, 'I always thought he was a f*cking fagot."  Fligor and the group left.

**{¶12}** Fligor's fourth interaction with appellant occurred on February 14, 2025, when Fligor and his wife stopped at the VFW "for a quick Valentine's date."  They ordered drinks and sat at a table in the back of the bar.  When his wife went to the restroom:

> I saw Tim Campbell walk by and then a brief moment later I heard him yelling my name.  Without leaving the chair I turned back around towards him and he said, 'I want to talk to you about the time I called you a fagot.' I said, 'Tim, now is not the time and the place to discuss this. If you want to talk about it later we can definitely do that.  But, please, just go.'  He leaned in close to me and said, 'if I slam your head through this f*cking wall I'll bet you will f*cking talk to me then.'  I said,

'Tim, no.'    That is when Tim hit me and I lost consciousness.

. . .

The next thing I remember is I heard my wife, I couldn't see anything, everything was still black, but I heard my wife say, 'Shane, wake up, Shane, wake up, Shane, please wake up.'  I began to hear other voices saying 'come on, Shane, what is going on, what happened, what is going on.'  When I was able to open my eyes I was sitting on the floor, I could taste blood in my mouth.  I couldn't see really who was around me, I couldn't even make out my wife.  I sat there for, I don't know exactly how long. And finally I said, 'Please get me up, get me up, get me out of this area,' because we were still in the bar area.

{¶13} After Fligor washed blood off his face, his wife drove him to the police station and the hospital, where he received five stitches in his right ear and learned he had a broken nose and a sprained neck.  A few days later, Fligor had "a lot of headaches, trouble seeing, very nauseated, was sleeping a lot," so he visited the VA Medical Center, which diagnosed him with a concussion.  Fligor explained,

Still to this day, I have a lot of ringing in my right ear, my neck is still stiff, I mean it's a lot better than it actually was, I'm having trouble sleeping, incredibly anxious, there are times that I'll be in the classroom or I'll been having a communication with somebody and I will completely forget what we were talking about what I was saying at that time.  And somebody will remind me what we were talking about and it's like I'm completely lost.  It will take me several minutes to get everything back.

{¶14} Fligor testified that he attended the annual Cadet Corp Ball, the next day.  Because Fligor is a Cadet Corp leader, he explained that he needed "to be there for them."  At the

dance, Fligor "was in excruciating pain, I had a severe headache, my nose hurt, my ear hurt." Fligor said that the music and bright lights bothered him, and he spent the majority of the event "in the hallway, in the bathroom, throwing up, or out in my car until I could get the headache to subside and I could come back in the room." Fligor and his wife left early. Fligor also testified that he and his wife attended a basketball game earlier in the day, but he did not remember attending it. On cross-examination, Fligor acknowledged that he had been diagnosed with tinnitus previously and already took medication for anxiety related to his post-traumatic stress disorder (PTSD) from previous deployments.

{¶15} Jennifer Fligor, the victim's wife, testified that she is self-employed and previously served as a combat medic in the military. Ms. Fligor testified that she only knew appellant "by our previous encounters. . . we have had several encounters with him variously over the years." For example, before the assault on February 14, Ms. Fligor explained that they joined friends for dinner at a restaurant, and had just been seated, when appellant approached them, looked at Fligor and said, "I always pinned you for a fagot." The group left the restaurant.

{¶16} On February 14, Ms. Fligor stated that, although she did not notice appellant at the VFW, later, when she excused herself to visit the ladies' room, as she washed her hands, she

heard "people starting to yell, 'Shane is hurt, Shane is hurt.'" When Ms. Fligor arrived, "he was completely slumped up against the wall, down, his head was crunched up against his chest, he was unconscious, and there was blood everywhere. . . his hands were inverted, almost like a seizure activity that you see. His eyes were rolled back." Fligor confirmed that her husband was breathing, tried to get him up so she could clear his airway, and yelled for someone to call an ambulance. After a few seconds, Fligor regained consciousness and asked to be removed from that area, so Ms. Fligor moved him to a back room to clean him and ensure he was fully conscious. After that, the couple drove to the police station, then to the hospital.

{¶17} Ms. Fligor testified that she is a photographer and needed to work a basketball game the following day, but did not want to leave her husband home alone because he showed signs of concussion, such as headaches and nausea. At the game, Fligor sat in the corner with Ms. Fligor's camera gear and wore earplugs. Later that evening, the couple attended the Cadet Corps Ball and "[Fligor] was very much not there." Ms. Fligor drove because she did not trust him to drive and Fligor slept most of the way. After the music started at the event, Fligor excused himself and stayed away from the loud music and bright lights "because he kept complaining that everything was making

his stomach nauseous and the bright lights were hurting his head." They left early.

{¶18} Greenfield McClain High School Military Science Instructor John Wilson served in the Air Force for 20 years. Wilson observed Shane Fligor at the military ball on February 15. When the music started and the lights flickered, Wilson noticed "that [Fligor] . . . winc[ed], his eyes bugged a little bit. . . and on several occasions he departed that area and went out into the lobby area."

{¶19} At the close of appellee's case, the trial court overruled appellant's Crim.R. 29 motion for judgment of acquittal.

{¶20} Appellant's brother-in-law, Aaron Penn, testified that he observed Fligor at the basketball game on February 15 and did not notice anything unusual about him other than a scab on his nose, even though Penn knew of the beating the night before.

{¶21} Appellant testified that he had only seen Shane Fligor twice outside of school. At Furmans, Fligor and his fiancé were sitting at the bar, "and I was looking around like I always do because of PTSD and working as a correction officer, I always know what my surroundings are." Appellant stated that Fligor, "yelled across and said, 'that is my wife you're looking at.' And I was like, and I said, and I said, 'this is my fiancé,' and I said, 'I'm very sorry, but I thought you were gay. I did say

that."  Appellant explained that Fligor "stood up, took a pretty good defensive posture for a few minutes and I just turned around."

{¶22} On February 14, appellant arrived at the VFW about 45 minutes before he punched Fligor.  "I had noticed Shane, and I walked up to Shane and I said, 'hey, Shane, I would like to apologize for the words we had.' "  Shane said, "F off, not here."  Appellant said, "You're going to say something to the wrong person, like you're doing in one of these places late at night in a bar like this, and they are probably going to put your head through that wall."  Fligor said, "F' off."  When asked on cross-examination, "you don't like to be told no, do you?" appellant replied, "No."

{¶23} After hearing the evidence, the jury found appellant not guilty of R.C. 2903.11(A)(1) felonious assault, but guilty of first-degree misdemeanor assault in violation of R.C. 2903.13(A).

{¶24} Subsequently, the trial court proceeded to sentencing and the victim gave a statement:

> I did nothing to [provoke] Mr. Campbell.  When this situation happened my kids let me know that he was a teacher at their school and has taught them.  I fear for my safety, I fear for  my children's safety.  I have been deployed four times and  my wife has never had to deal with me getting hurt.  Until I came home and was attacked by Mr. Campbell.  I ask that he please be

incarcerated and that we do everything we can to make sure that Mr. Campbell never approaches me, my family, my parents, any of our family because I do fear retaliation.

In addition, Mrs. Fligor gave a victim impact statement:

I just ask that, like Shane said, that you take into consideration that as a spouse to have to come around the corner and see their spouse on the floor like that. I have been deployed to Iraq, and I'm telling you that I was never so scared as I was that night seeing my husband bleeding on the floor for no reason, hearing somebody scream through a place where we call home, the VFW, that is our safety net, as veterans. And I never want anybody else to have to hear that again.

In allocution, appellant provided the following:

I just want to apologize to Mr. Fligor, and to everybody else, the Jury did find me guilty, my peers did, and I apologize and I am sorry everything happened. And I hope things go better for the both of us and everyone, and thank everyone for being here.

The trial court then stated:

Well, in my opinion, this verdict was the result of the law. Next to the definition of recklessly the definition of serious physical harm is the most poorly worded statute in the Criminal Code. And the way I look at it, would I be willing to trade places and accept the harm that was caused in this case. And I think the answer to that I, no. But, unfortunately, the way the law is drafted the jury found that it did not meet that standard. And so, you know, that is the reason we have this verdict that we do.

I will say this, Mr. Campbell, I think that you are a liar, I think you're a bully, I think you have got a big mouth, there is no reason for you to go after Mr. Fligor at all. So what if other people in the school didn't like him, I don't know if that is true or not, I don't believe you. But even if were, so what, why is that your business, why do you go out and confront him at a bar. You know, if you had to use self-defense, if you

are worried about yourself and getting hurt then you need to start shutting your big mouth and keep it to yourself. But, no, you want to go out and show everybody what a tough guy you are. Which you're just a bully. Mr. Fligor walked away, there is no evidence at all in this case that you acted in self-defense and everybody in this case knows that.

So, the Court feels in order to send a message and make sure hopefully that the Department of Education revoked your credentials as a substitute teacher, because, you know, if there is a worse example of somebody to the youth of a school I don't know who it could be, maybe a sex offender. But other than that what you have done is a disgrace. And to just walk in there and assault this man in a VFW too. And other organizations. You know, veterans are [supposed] to be there for an exchange of fellowship and camaraderie and support of each other and not to go in and attack each other. Or in this case you attacked him. And totally unprovoked. And I don't believe your story, neither did the jury, for a minute. They found you guilty because of what they believed the law required and felt that the State did not prove that.

**{¶25}** At that juncture the trial court sentenced appellant to (1) serve a 180-day jail sentence, (2) pay a $1,000 fine, and (3) pay costs. On September 30, 2025, appellant filed a motion to stay his sentence pending appeal. After an October 6, 2025 hearing, the trial court granted the motion upon the following conditions: (1) defendant post a $10,000 bond, (2) all previous conditions as stated in the arraignment entry remain in effect, (3) defendant is not permitted to substitute teach at Greenfield School District or be on premises owned by them, (4) defendant shall not have any contact directly or indirectly with the victim or any witnesses who testified at trial, and (5) if the court of appeals affirms the conviction, defendant shall report

to the Highland County Sheriff's Office within two business days to complete his sentence.  This appeal followed.

                                    I.

{¶26} In his first assignment of error, appellant asserts that the trial court's sentence, which included both the maximum jail time and the maximum fine, constitutes an abuse of discretion.  Appellee, however, contends that the trial court considered the proper statutory framework and the sentence is within the authorized range.

{¶27}  " 'We review a misdemeanor sentence for an abuse of discretion.' "  *State v. Williams*, 2016-Ohio-733, ¶ 17 (4th Dist.), quoting *State v. Marcum*, 2013-Ohio-2447, ¶ 22 (4th Dist.).  "An abuse of discretion consists of more than an error of judgment; it connotes an attitude on the part of the trial court that is unreasonable, unconscionable, or arbitrary." *State v. Wyatt*, 2002-Ohio-4479, ¶ 20 (4th Dist.), citing *State v. Lessin*, 67 Ohio St.3d 487 (1993), citing *Rock v. Cabral*, 67 Ohio St.3d 108 (1993).  "An abuse of discretion includes a situation in which a trial court did not engage in a 'sound reasoning process'; this review is deferential and does not permit an appellate court to simply substitute its judgment for that of the trial court."  *State v. Felts*, 2016-Ohio-2755, ¶ 29 (4th Dist.), quoting *State v. Darmond*, 2013-Ohio-966, ¶ 34.

**{¶28}** Pursuant to R.C. 2929.21 and 2929.22, trial courts possess broad discretion to determine the appropriate sentence for misdemeanor cases. *State v. Kinsworthy*, 2014-Ohio-2238, ¶ 30 (12th Dist.). In doing so, a trial court must be guided by the purposes of misdemeanor sentencing, which are "to protect the public from future crime by the offender and others and to punish the offender." R.C. 2929.21(A). The court must also consider the factors that are relevant to achieving the purposes and principles of misdemeanor sentencing. R.C. 2929.22(B)(3). "To achieve those purposes, the sentencing court [must] consider the impact of the offense upon the victim and the need for changing the offender's behavior, rehabilitating the offender, and making restitution to the victim of the offense, the public, or the victim and the public." R.C. 2929.21(A).

**{¶29}** In determining the appropriate sentence for a misdemeanor, a trial court must consider seven factors listed under R.C. 2929.22(B)(1):

(a) The nature and circumstances of the offense or offenses;

(b) Whether the circumstances regarding the offender and the offense or offenses indicate that the offender has a history of persistent criminal activity and that the offender's character and condition reveal a substantial risk that the offender will commit another offense;

(c) Whether the circumstances regarding the offender and the offense or offenses indicate that the offender's history, character, and condition reveal a substantial risk that the offender will be a danger to others and

that the offender's conduct has been characterized by a pattern of repetitive, compulsive, or aggressive behavior with heedless indifference to the consequences;

(d) Whether the victim's youth, age, disability, or other factor made the victim particularly vulnerable to the offense or made the impact of the offense more serious;

(e) Whether the offender is likely to commit future crimes in general, in addition to the circumstances described in divisions (B)(1)(b) and (c) of this section;

(f) Whether the offender has an emotional, mental, or physical condition that is traceable to the offender's service in the armed forces of the United States and that was a contributing factor in the offender's commission of the offense or offenses;

(g) The offender's military service record.

**{¶30}** A trial court may also consider "any other factors that are relevant to achieving the purposes and principles of sentencing set forth in [R.C. 2929.21.]" R.C. 2929.22(B)(2). In addition, the court must consider "any relevant oral or written statement made by the victim, the defendant, the defense attorney, or the prosecuting authority regarding sentencing for a misdemeanor." R.C. 2929.22(D)(1).

**{¶31}** "Although it is preferable that a trial court affirmatively state on the record that it considered the criteria set forth in R.C. 2929.21 and R.C. 2929.22, the statute does not mandate that the record state that the trial court considered the applicable statutory factors." *Kinsworthy* at ¶ 30; *State v. McClurg,* 2020-Ohio-1144, ¶ 7 (2d Dist.). Moreover,

"a trial court is presumed to have considered the statutory factors when the sentence is 'within the statutory limits and there is no affirmative showing that the trial court failed to do so.' " *Id.*, quoting *State v. Collins,* 2005-Ohio-4755, ¶ 12 (3d Dist.); *McClurg, id.* "Unless a mandatory jail term or specific sanction is required to be imposed, a trial court has discretion to determine the most effective way to achieve the purposes and principles of misdemeanor sentencing, which may include any sanction or combination of sanctions authorized." *State v. Horr*, 2022-Ohio-3160, ¶ 5 (2d Dist.), citing R.C. 2929.22(A).

{¶32} Relevant to the case at bar, R.C. 2929.22(C) provides that the maximum jail term for a misdemeanor may only be imposed "upon offenders who commit the worst forms of the offense" or "upon offenders whose conduct and response to prior sanctions for prior offenses demonstrate that the imposition of the longest jail term is necessary to deter the offender from committing future crime." R.C. 2929.22(C). In the case sub judice, appellant claims that the trial court's decision to impose the maximum jail term for his offense does not comply with the requirements of R.C. 2929.22(C) because: (1) the trial court did not order a Pre-Sentence Investigation (PSI), and (2) the trial court relied on his personal animus towards appellant and his identification with the victim in sentencing appellant.

{¶33} Because the trial court did not order a PSI, the only basis on which the trial court could have imposed a maximum jail term is by concluding that appellant committed one of the worst forms of the offense of assault. R.C. 2929.22(C). "The phrase 'worst forms of the offense' is not defined by statute, and is left primarily to the trial court's discretion to determine its meaning." *State v. Huff,* 2000 WL 1741901 (7th Dist. Nov. 20, 2000), citing *State v. Mushrush,* 135 Ohio App.3d 99 (1st Dist.1999). Thus, "[t]he General Assembly must have intended the phrase 'worst forms of the offense' to include many conceivable forms, because the plural 'forms' contemplates 'not just a single form of any offense that is the worst, but that more than one situation may be one of the worst forms of the offense.' " *Mushrush* at 110, quoting *State v. Patterson*, 1998 WL 720733, * 4 (4th Dist.); *State v. Scott,* 2023-Ohio-476, ¶ 13 (2d Dist.).

{¶34} Appellant asserts that the trial judge relied on his "personal animus" towards appellant and his "identification with the victim in the case" in sentencing appellant, and that the record reflects that the trial judge became irritated and frustrated by the fact that the jury found appellant guilty of the lesser-included offense of assault and not felonious assault. Appellee, on the other hand, argues that R.C. 2929.22(B)(1) expressly authorizes a trial court to consider

whether the offender's conduct caused or threatened physical harm and whether the offender presents a substantial risk of future offenses.  Appellee contends that nothing required the trial court to ignore the seriousness of the conduct simply because the jury convicted on a lesser-included offense. Moreover, appellee submits that judges may comment on the seriousness of an offense, the defendant's conduct, and the court's assessment of responsibility and accountability.

**{¶35}**  Generally, when a defendant wishes to raise a challenge to a trial judge's objectivity, he must utilize the procedure for filing an affidavit of disqualification set forth in R.C. 2701.03.  *State v. Casada*, 2016-Ohio-2633, ¶ 25 (8th Dist.), citing *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463 (1956), paragraph three of the syllabus.  A court of appeals has "no authority to determine a claim that a trial judge is biased or prejudiced against a defendant and no authority to void a trial court's judgment based on a claim that the trial judge is biased or prejudiced."  *State v. Williamson*, 2016-Ohio-7053, ¶ 27 (8th Dist.).  However, in *State v. Power*, 2013-Ohio-4254 (7th Dist.), the Seventh District explained that an appellate court may review biased comments at sentencing for due process violations.  *Id.* at ¶ 22, citing *State v. Arnett*, 88 Ohio St.3d 208, 218 (2000).

**{¶36}** Ohio law generally permits trial judges to make critical comments about a defendant's conduct at sentencing. *See State v. Thomas,* 36 Ohio St.2d 68, 71 (1973).  Judicial bias has been described as

> a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts.

*State v. Dean*, 2010-Ohio-5070, ¶ 48, quoting *Pratt, supra,* 164 Ohio St. 463, paragraph four of the syllabus.  "If the trial judge forms an opinion based on facts introduced or events occurring during the course of the current or prior proceedings, this does not rise to the level of judicial bias, 'unless [the opinions] display a deep-seated favoritism or antagonism that would make fair judgment impossible.' "  *State v. Hough*, 2013-Ohio-1543, ¶ 11 (8th Dist.), citing *Dean* at ¶ 49, quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994).

**{¶37}** The law presumes that a judge is unbiased and unprejudiced in the matters over which he or she presides, and the appearance of bias or prejudice must be compelling in order to overcome the presumption.  *Power*, *supra,* at ¶ 23, citing *In re Disqualification of Olivito*, 74 Ohio St.3d 1261, 1262 (1994). In *Power*, the defendant argued that the trial court demonstrated bias against him during sentencing due to comments the court

made to the victim's mother (calling her a bad mother because she failed to report the abuse to her daughter sooner), and telling the defendant, "What you did here is despicable. It's beyond understanding." *Power* at ¶ 13. The Seventh District concluded that the trial court's comments "do not come near the level of a due process violation or otherwise constitute reversible sentencing error." *Id.* The court explained:

> [O]pinions formed by the judge on the basis of facts in the record do not constitute a basis for a bias or partiality motion unless they display a deepseated antagonism that would make fair judgment impossible. *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, ¶ 49. Hence, critical, disapproving, or even hostile statements ordinarily do not support a bias or partiality challenge. *Id.*

> It is not reversible error for a sentencing judge, in explaining his sentence, to make critical statements about a defendant's conduct based upon the facts of the case presented to the court. *See, e.g., State v. Cemino*, 2d Dist. No. 24442, 2011-Ohio-5690 [2011 WL 5326563], ¶ 8, 18-20 (scolding defendant and characterizing what he did as nasty, despicable, disgusting, and awful was not indicative of bias); *State v. Coomer*, 12th Dist. Nos. CA2009-09-016, CA2009-09-017, 2010-Ohio-3474 [2010 WL 2891748], ¶ 18 (trial court's statement that the defendant was a psychopath may have been ill-advised, but it was not reversible).

> *Power* at ¶ 26-27.

**{¶38}** Similarly, in *State v. Filous,* 2016-Ohio-8312 (8th Dist.), the trial court mocked the defendant's efforts to rehabilitate himself, discredited his sobriety and his obtainment of both a driver's license and a job, called his mother a "liar," and mocked the defendant's "expression of

remorse." The Eighth District concluded that the exchange did not evidence judicial bias, and held that "[i]t is not reversible error for a sentencing judge, in explaining his sentence, to make critical statements about a defendant's conduct based upon the facts of the case presented to the court." *Id.* at ¶ 16, citing *Power* at ¶ 27. Further, the court found no error in the trial court's challenge of the defendant's sincerity or credibility when the defendant made contradictory statements. Finally, although the court found the trial court's characterization of Filous's mother unduly harsh, it did not conclude that the criticism evidenced judicial bias. *Id.*, *see State v. Clay*, 2008-Ohio-1415, ¶ 22-23 (8th Dist.) (sentencing court's criticism of defendant's mother was not reversible).

{¶39} In *State v. Corchado*, 2017-Ohio-4390 (7th Dist.), after the prosecutor made his rebuttal closing argument and characterized Corchado as "simply not credible," the trial court stated that Corchado's testimony was "totally incredible, absolutely incredible. Shame on you. I have absolutely no difficulty at all in finding that you are guilty of assault as charged." *Id.* at ¶ 16. During sentencing, in addition to other "intemperate comments," the trial court expressed its disgust for Corchado's "immature" and "ridiculous" conduct and "shamed Corchado as a mother for acting in such a manner." *Id.* at ¶ 17. The court explained: "These comments, and others made by the

trial court, are akin to those in *Power*, and were at times ill-advised and inappropriate.  Nonetheless, the trial court's statements do not rise to the level of a due process violation or reversible sentencing error."  *Id.*

**{¶40}** Appellant cites *State v. Yeban,* 2024-Ohio-2545 (1st Dist.) in support.  Yeban testified at his trial for operating a motor vehicle while under the influence of alcohol and other traffic violations.  Prior to sentencing, Yeban informed the trial judge that he would bring a lawsuit under the Uniform Commercial Code (UCC) and common law against the court and stated that he did not recognize the court's legitimacy.  *Id.* at ¶ 20.  When the trial court sentenced Yeban to the maximum jail term of 180 days, the First District reversed, holding that the trial court focused on two factors unrelated to the offense: Yeban's perceived lies to the jury and his views on sovereign citizenship.  The court held that, "[o]n a silent record, reviewing courts often presume that trial courts considered the proper statutory criteria for a misdemeanor sentence."  *Id.* at ¶ 70.  However, the court held that this presumption, "is destroyed when the trial court introduces an improper factor into the maximum sentencing determination."  *Id.*, citing *State v. Brooks*, 2006-Ohio-4610, ¶ 26 (7th Dist.)(trial court indicated at sentencing that it would impose maximum jail term "based on its assessment that the defendant was lying in court."

This constituted abuse of discretion because trial court's perception as to defendant's truthfulness fell outside the R.C. 2929.22(C) criteria for maximum sentences.)  *Id.* at ¶ 25-26.

**{¶41}** In *Yeban,* the First District concluded that the trial court's explanation made it clear that the court contemplated community control as the appropriate punishment for Yeban's conduct, but elected instead to sentence him to 180 days in jail, not because it determined that Yeban committed the worst form of OVI or because Yeban's response to prior criminal punishments made him likely to commit another crime, but because the court impermissibly weighed Yeban's perceived lying and Yeban's proclamation that he was a sovereign citizen rather than the criteria set forth in R.C. 2929.22(C).  *Id.* at ¶ 72; *see Brooks* at ¶ 25-26.

**{¶42}** We do not agree with appellant's argument concerning the application of the First District's analysis to the case at bar.  Although here, the trial court moved forward with sentencing without the benefit of a PSI, the trial court's comments indicate both skepticism at appellant's credibility as well as concern over the assault itself and the three prior incidents in which appellant approached the victim and harassed him, as well as the physical harm appellant caused in the final incident.  As appellee notes, appellant's argument improperly conflates judicial candor with judicial bias.  *See also Dean,*

2015-Ohio-4347, ¶ 225-227 (trial court's comments, stating that it might sound ridiculous to aggravated murder defendant that court sentenced defendant to death plus additional 125 years imprisonment and court wanted to make sure that defendant understood that it was court's fervent hope that defendant never walk the streets again as a free man, did not exhibit a bias that deprived defendant of due process or a fair trial; court's statements were founded on facts taken from the record and not an extrajudicial source, and although the statements reflected court's opinions about defendant's conduct, they did not indicate that court possessed a deep-seated favoritism or antagonism that would make fair judgment impossible); *Liteky,* 510 U.S. at 550-551 (presiding judge may, upon completion of the evidence, "be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task.")

**{¶43}** In addition to taking issue with the trial court's comments regarding appellant being a liar and a bully, appellant argues that the trial judge "was irritated and frustrated" that the jury found appellant guilty of the lesser-included offense

of assault rather than felonious assault. However, we point out that the court did not second-guess the jury. Rather, the court noted that the somewhat confusing statutory definitions brought about the verdict. Although these comments may have been arguably inappropriate, they do not rise to the level of a due process violation or reversible sentencing error. Moreover, appellant did not establish prejudice. Appellant engaged in multiple attempted altercations with the victim, and ultimately assaulted him and caused him physical injury. Despite the trial court's strong language, the court imposed a sentence within the statutory range. Thus, appellant's sentence does not constitute an abuse of discretion.

{¶44} Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.

II.

{¶45} In his second assignment of error, appellant asserts that the trial court abused its discretion when it imposed a district-wide employment prohibition as a condition of stay pending appeal. Appellee, however, contends that (1) this assignment of error is moot, and (2) even if reviewed on the merits, the trial court did not abuse its discretion under Ohio law.

{¶46} The determination of whether to issue a stay of proceedings generally rests within the trial court's sound

discretion and will not be disturbed on appeal absent an abuse of discretion.  *In re B.N.S.*, 2020-Ohio-4413, ¶ 13 (12th Dist.); *In re Goff,* 2003-Ohio-6087, ¶ 19 (11th Dist.).  An abuse of discretion is more than an error in judgment or law and connotes that the trial court's decision is arbitrary, unreasonable, or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{**¶47**} As appellant points out, Ohio Appellate Rule 7 provides that a party may seek a discretionary right to bail and suspension of the execution of a criminal sentence pending appeal.  However, appellee contends that this assignment of error is moot because a stay of appeal exists for one purpose only: to preserve the status quo while appellate review is ongoing.  App.R. 7(A).  Thus, appellee argues that once this appeal is resolved, the stay terminates by operation of law, and all attached conditions necessarily dissolve.  We agree.

{**¶48**} In *State v. Roberts,* 2008-Ohio-3835, the Supreme Court of Ohio explained, "The effect of a stay pending review in a criminal appeal is preventive in nature.  It preserves the status quo of the litigation pending appellate review and suspends the power of the lower court to issue execution of the judgment or sentence."  *Roberts* at ¶ 24, citing *Loeb v. State* (Fla.App.1980), 387 So.2d 433, 435-436.  R.C. 2949.02(A) provides that when a person convicted of a bailable offense

gives written notice of intention to appeal, "the trial judge or magistrate may suspend . . . execution of the sentence or judgment imposed for any fixed time that will give the person time either to prepare and file, or to apply for leave to file, the appeal."  The statute further provides that "the trial judge or magistrate may release the person on bail in accordance with section 2937.011 of the Revised Code, and the bail shall at least be conditioned that the person will appeal without delay and abide by the judgment and sentence of the court."  The language of R.C. 2949.02 specifies that bail conditions must "at least" require that the defendant appeal without delay and abide by the court's judgment and sentence.  We believe that this language suggests courts have some discretion to impose additional conditions, but the statute does not enumerate what those conditions might include.

**{¶49}** Appellant contends that a district-wide employment ban against appellant constitutes an abuse of discretion.  Appellant cites *State v. Henny*, 2025-Ohio-4975 (1st Dist.) in support.  In *Henny,* following a guilty plea to attempted vandalism, the trial court imposed a community-control sanction term and a term of her general probation that prohibited Henny from possessing firearms, requiring her to seek new employment as she worked at a pawn shop.  *Id.* at ¶ 7.  The First District Court of Appeals concluded that restricting Henny from her current employment is

not reasonably related to her rehabilitation, *id.* at ¶ 16, and the gun restriction had no relationship to the vandalism conviction. *Id.* at ¶ 17. Thus, the court held that, although related to criminal conduct or reasonably related to future criminality, the measure constituted an overbroad condition to the extent that it prevented Henny from maintaining her employment. *Id.*

**{¶50}** However, as appellee points out, the case at bar does not involve community control sanctions, but rather a stay of the execution of sentence pending appeal. Consequently, our decision moots this assignment of error. Generally, appellate courts do not address issues that become moot. *Redmon v. Columbus City Council*, 2006-Ohio-2199, ¶ 5-6 (10th Dist.); *In re Brown*, 2005-Ohio-2425, ¶ 15-16 (10th Dist.). This is because an appellate court's jurisdiction is limited to actual cases or controversies under Section 2, Article III of the Ohio Constitution. If an issue or case is moot, there is no longer a case or controversy to resolve. *State v. Winland*, 2005-Ohio-3408, ¶ 6 (11th Dist.); *State v. Graves,* 2008-Ohio-5763, ¶ 5 (4th Dist.). Thus, because the employment restriction dissolves by operation of our disposition of the case sub judice, we conclude that this issue is moot.

**{¶51}** Accordingly, we overrule appellant's second assignment of error.

III.

{¶52} In his third assignment of error, appellant asserts that his trial counsel rendered ineffective assistance of counsel in violation of his constitutional guarantees.  In particular, appellant contends that his counsel provided ineffective assistance of counsel by failing to object to the district-wide employment ban imposed in the stay of sentence pending appeal.

{¶53} The standard of review for ineffective assistance of counsel claims is de novo.  *State v. Weaver*, 2022-Ohio-4371, ¶ 25, citing *State v. Gondor*, 2006-Ohio-6679.  To evaluate an ineffective assistance of counsel claim, *Strickland v. Washington*, 466 U.S. 668 (1984) sets forth the standard for judging ineffective assistance.

{¶54} The Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense.  The United States Supreme Court has generally interpreted this provision to mean a criminal defendant is entitled to the "reasonably effective assistance" of counsel.  *Strickland, supra.*

{¶55} To establish constitutionally ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was deficient and (2) the deficient performance

prejudiced the defense and deprived the defendant of a fair trial. *See Strickland*, 466 U.S. at 687; *State v. Myers*, 2018-Ohio-1903, ¶ 183; *State v. Powell*, 2012-Ohio-2577, ¶ 85. "Failure to establish either element is fatal to the claim." *State v. Jones*, 2008-Ohio-968, ¶ 14 (4th Dist.). Moreover, if one element is dispositive, a court need not analyze both. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000).

{¶56} The deficient performance part of an ineffectiveness claim "is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' " *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010), quoting *Strickland*, 466 U.S. at 688. Prevailing professional norms dictate that "a lawyer must have 'full authority to manage the conduct of the trial.' " *State v. Pasqualone*, 2009-Ohio-315, ¶ 24, quoting *Taylor v. Illinois*, 484 U.S. 400, 418 (1988).

{¶57} Further, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. Accordingly, "[i]n order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation." *State v. Conway*, 2006-Ohio-2815, ¶ 95 (citations omitted). In addition, when considering whether trial counsel's representation amounts to deficient performance,

"a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* Additionally, "[a] properly licensed attorney is presumed to execute his duties in an ethical and competent manner." *State v. Taylor*, 2008-Ohio-482, ¶ 10 (4th Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 100 (1985). Therefore, a defendant bears the burden of showing ineffectiveness by demonstrating that counsel's errors were "so serious" that counsel failed to function "as the 'counsel' guaranteed ... by the Sixth Amendment." *Strickland*, 466 U.S. at 687; *e.g., State v. Gondor*, 2006-Ohio-6679, ¶ 62; *State v. Hamblin*, 37 Ohio St.3d 153, 156 (1988).

{¶58} To establish prejudice, a defendant must demonstrate that a reasonable probability exists that "but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the outcome." *Strickland*, 466 U.S. at 694; *e.g., State v. Short*, 2011-Ohio-3641, ¶ 113; *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus; *accord State v. Spaulding*, 2016-Ohio-8126, ¶ 91 (prejudice component requires a "but for" analysis). "[T]he question is whether there is a

reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695.  Further, courts ordinarily may not presume the existence of prejudice; rather, they must require a defendant to establish prejudice affirmatively.  *State v. Clark*, 2003-Ohio-1707, ¶ 22 (4th Dist.).  Moreover, we have recognized that speculation is insufficient to establish the prejudice component of an ineffective assistance of counsel claim.  E.*g.*, *State v. Tabor*, 2017-Ohio-8656, ¶ 34 (4th Dist.); *State v. Jenkins*, 2014-Ohio-3123, ¶ 22 (4th Dist.); *State v. Simmons*, 2013-Ohio-2890, ¶ 25 (4th Dist.); *accord State v. Powell*, 2012-Ohio-2577, ¶ 86.

**{¶59}** We note that trial counsel's "failure to make objections is not alone enough to sustain a claim of ineffective assistance of counsel."  *State v. Conway*, 2006-Ohio-2815, ¶ 103; *accord State v. Sowell*, 2016-Ohio-8025, ¶ 144 (rejecting argument that failing to preserve error is inherently prejudicial and stating, "[i]t is not enough that an alleged error resulted in a disadvantage for an accused").  Instead, a defendant still must "show that any particular failure to object substantially violated an[ ] essential duty [and] was prejudicial."  *State v. Fears*, 86 Ohio St.3d 329, 347 (1999); *accord State v. Holloway*, 38 Ohio St.3d 239, 244 (1988) (stating that failure to object insufficient on its own to establish

ineffective assistance of counsel; instead, a defendant still must demonstrate that counsel substantially violated an essential duty and that counsel's performance materially prejudiced the defense); *accord State v. Platt,* 2024-Ohio-1330 (4th Dist.).

**{¶60}** In addition, trial counsel's decision to object, or not to object, may be a legitimate trial strategy or tactical decision for the reason that " 'each potentially objectionable event could actually act to [the defendant]'s detriment.' " *State v. Johnson*, 2006-Ohio-6404, ¶ 140, quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (C.A. 6, 2006). Thus,

> any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice.

**{¶61}** *Johnson* at ¶ 140, quoting *Lundgren*, 440 F.3d at 774; *cf. United States v. Cronic*, 466 U.S. 648, 656 (1984) (describing the right to the effective assistance of counsel as "the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing").

**{¶62}** In the case sub judice, appellant argues that no strategic reason exists for counsel's failure to object to the district-wide employment ban placed on appellant. Appellant

again cites *Henny*, *supra,* 2025-Ohio-4975, the community-control sanction case we distinguished above. The decision whether to object at sentencing or during a stay hearing is a matter of trial strategy. When reviewing ineffective-assistance claims, we will not second-guess trial-strategy decisions. *State v. Miller*, 2025-Ohio-197, ¶ 30 (2d Dist.), citing *State v. Mason*, 82 Ohio St.3d 144, 157 (1998); *Strickland* at 689. " 'Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available.' " *Miller* at ¶ 30, quoting *State v. Conley*, 2015-Ohio-2553, ¶ 56 (2d Dist.). "When a claim of ineffective assistance of counsel is based on counsel's failure to file an objection or file a motion, the appellant must demonstrate that the objection or motion had a reasonable probability of success." *State v. Jones*, 2019-Ohio-2134, ¶ 52 (10th Dist.) (citing cases). "If the objection or motion would not have been successful, then the appellant cannot prevail on an ineffective assistance claim." *Id.*

**{¶63}** Appellant points to *State v. Burgins,* 44 Ohio App.3d 158 (4th Dist.1988) for the proposition that, "[w]hile defense tactics, even ineffective ones, are usually not considered grounds for reversal, where there has been such a deviation from the norm that ordinary trial counsel would scoff at hearing of

it, a reviewing court may reverse a guilty verdict and order a new trial." *Id.* at syllabus.  However, while unusual, we do not believe that failing to object to an employment restriction during the pendency of an appeal is such a deviation from the norm.  Our review of the record in the case sub judice reveals that appellant fails to demonstrate that the objection to the employment restriction in the stay of appellant's sentence pending appeal would have been sustained.  Thus, appellant did not demonstrate ineffective assistance of counsel.

{¶64} Accordingly, based on the foregoing reasons, we overrule appellant's third assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Highland County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period set forth in the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Hess, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 22, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.